# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **PATTERSON & WILDER CONSTRUCTION CO., INC.,** | ] |
| Plaintiff(s), | ] |
| vs. | ] CV 97-N-2840-S |
| **UNITED STATES OF AMERICA,** | ] |
| Defendant(s). | ] |

## Memorandum of Opinion

### I.   Introduction.

Presently before the court is the defendant's motion to dismiss, or in the alternative for summary judgment, filed August 16, 1999 (Doc. No. 29).[1] The issues have been fully briefed and the parties were afforded an opportunity to be heard orally at the court's regularly scheduled motion docket on September 28, 1999.[2] The motion is now ripe for decision and, upon due consideration, will be granted.

Plaintiff Patterson & Wilder Construction Company ("Patterson") sues the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, alleging that the government is liable to it for damages resulting from the loss of a certain aircraft in which the plaintiff had an interest as a lessee. Specifically, the plaintiff claims that the United States

---

[1] The government moves to dismiss the plaintiff's claims under the Federal Tort Claims Act for lack of subject matter jurisdiction and for failure to state a claim. As matters outside the pleadings have been presented to and considered by the court, the court will treat the motion as one for summary judgment.

[2] The parties were actually heard on the motion on October 6, 1999, due to a personal conflict of counsel in this case.

Customs Service ("Customs") caused or permitted the loss of the aircraft while, without permission of the lessee, it was engaged in an undercover drug operation in Colombia.[3]

## II. Statement of Facts.[4]

Patterson is incorporated and headquartered in Pelham, Alabama. Frank Patterson ("Mr. Patterson") is president and owner of all the stock in the company. William Latham ("Mr. Latham"), a long term employee of Patterson, is the president of Latham Aviation ("Latham"). Latham was created after Patterson, apparently for the purpose of assuming ownership of and leasing to Patterson a Baron aircraft previously owned by Mr. Latham, which had been contracted to Patterson for its use.[5] Latham then became the employer of the pilot, Stuart Boyd ("Boyd"), who had previously been an employee of Patterson.

In 1993, Boyd contacted Jason Reynolds ("Reynolds"), a pilot and former co-worker of Boyd's, to enlist his services in replacing the Baron aircraft with a Merlin aircraft.[6] Latham purchased a Merlin aircraft in the August-September period of 1993.[7] Reynolds received a commission from Latham for his services in brokering the purchase of the new aircraft.

---

[3] Seldom does the court have an opportunity to review such interesting matters as presented here. The scenario in this case, as shown by the evidence, could easily serve as the basis for an episode in a Tom Clancy novel. For a judge accustomed to dealing with run of the mill employment discrimination cases and hand-to-hand "crack" cocaine buys, this is indeed a diversion from the ordinary.

[4] The facts set out below are gleaned from the parties' submission of facts, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[5] Though not clear from the parties' submissions, they apparently refer here to a Beechcraft Baron, typically a small twin engine aircraft with internal combustion and air cooled engines.

[6] Again, the parties are unclear but they apparently refer here to a Swearingin Merlin, a high performance twin engine aircraft which used turboprop engines and is capable of flying much higher and further than the Baron.

[7] The purchase price of the Merlin aircraft was between $235,000.00 and $245,000.00.

Latham then leased the Merlin, together with the services of Boyd as pilot, to Patterson for a period of 7 years. Patterson did not participate in the purchase of the aircraft, making no payments either toward the purchase price or any improvements to it.[8] At the expiration of the lease, Patterson had the option to purchase the Merlin at a price of $8,000.00.

Because Boyd was not then qualified to operate the Merlin, Latham added Reynolds to its aircraft insurance policy as a pilot and, he thereafter, acted in the role of a co-pilot on some business trips for Mr. Patterson and Mr. Latham. In order to become qualified to operate the Merlin, Boyd attended a flight training school, accompanied by Reynolds. Reynolds' expenses at the school and his compensation for accompanying Boyd there were paid by Patterson.

In early November of 1994, Customs Agent Daniel Dunn contacted Reynolds to inquire whether he would be interested in locating an aircraft and flying to Colombia, South America, as a participant in an undercover drug smuggling operation to be sponsored jointly by the United States Customs Service and the Drug Enforcement Administration ("DEA"). Reynolds for several years had been "documented" as a confidential source by Customs and had performed work as a pilot for Customs, the Florida Department of Law Enforcement, the Federal Bureau of Investigation, DEA, and other local and state agencies. Reynolds inquired of Boyd about the availability of the Merlin aircraft for the mission, and Boyd told him he could pick up the aircraft in Texas. Customs and DEA each provided

---

[8] The only major improvement to the aircraft was the installation of a global positioning system by Latham at a cost of approximately $10,000.00 to $11,000.00.

3

Reynolds, doing business as Wheels and Wings, Inc., $10,000.00 for expenses to be incurred for use of the aircraft.

Reynolds and a Customs pilot were flown on a Customs plane to Texas for the purpose of picking up the Merlin aircraft; the pilots then flew the aircraft to St. Petersburg, Florida, where it was stored in a Customs hanger for the night; and the next day, Reynolds flew the Merlin aircraft to Fort Lauderdale, Florida, where a military transponder was installed on the aircraft so that it could be tracked while in foreign airspace. Reynolds then returned the Merlin to St. Petersburg, Florida, where it was again kept in a Customs hanger until departure for the mission to Colombia. In the interval, Customs agents informed Reynolds of the mission, giving him the necessary information and coordinates for his destination, including a radio frequency to be used to contact his contact in Colombia. Another pilot who was scheduled to accompany Reynolds canceled his plans, requiring a replacement. Reynolds thus inquired whether Boyd was willing to co-pilot the mission. Boyd agreed, met with Customs agents, and was documented as a confidential source. En route to Colombia, Reynolds and Boyd stopped and spent the night at Howards Air Force Base in Panama, Central America, where they met with more Customs and DEA agents.

Upon landing at their destination in Colombia, Reynolds and Boyd were met by a local drug producer. They then flew, with the producer, to another location where the drugs were kept. When they arrived at the second location, however, Colombian police were waiting for them. Unable to secure their cargo, Reynolds and Boyd returned to their original landing point to wait while the producer traveled by jeep to retrieve the drugs. While the

producer was gone, Colombian police arrived on the scene and arrested Boyd and associates of the producer, marching them through the jungle to a ranch house.[9]

Soon, the Colombian drug producer returned with the drugs he had acquired but was forced to flee when the Colombian police opened fire on him. Later, the producer secured the release of his own associates, as well as Boyd and Reynolds, in exchange for bribe money and the Merlin aircraft to the police. The Colombian police attempted to fly the Merlin out of the jungle landing site but crashed it shortly after takeoff.

The Colombian producer and his associates later dragged the Merlin into the woods, burned it, and buried the wreckage, so that it would not be discovered later by other Colombian police.

Reynolds and Boyd spent eleven days with the Colombian producer traveling through the jungle to his home in Bogota. The producer purchased commercial airline tickets for Reynolds and Boyd and they returned to the United States through Miami, Florida.

When the aircraft disappeared and Boyd was absent, Mr. Patterson had reported that it had been stolen. Boyd informed him of the true facts upon his return to Birmingham. The FBI confirmed Boyd's story and informed Mr. Latham that the aircraft had indeed been used in a covert drug smuggling operation. Mr. Latham contacted Customs to let them know that the aircraft belonged to him and that he had not given permission for its use in the mission. Apparently, in separate conversations with Mr. Latham, Reynolds and Boyd each blamed the other for taking the aircraft. Patterson ceased making its lease payments to Latham.

---

[9] Apparently, Reynolds managed to escape detection and arrest by hiding in nearby woods while his companions were being arrested.

Reynolds, Boyd, and Latham entered into a settlement agreement, whereby Latham was paid $240,000.00 from funds that had been placed in an escrow account by Customs and DEA. Neither Mr. Patterson nor Patterson was a party to the settlement agreement.

## III.     Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The

nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be

7

granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

The government's primary argument in support of its motion for summary judgment is that both Reynolds and Boyd were independent contractors and not employees of the government. Thus, according to this argument, the United States cannot be held liable for the actions of the pilots.[10]

Sovereign immunity bars suits against the United States unless the government consents to be sued through a statutory waiver. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The government has granted such a limited waiver of sovereign immunity under the FTCA

---

[10] The government also moves for summary judgment on the grounds that "the discretionary function exception applies; no duty was owed to the Plaintiff; intervening acts of third parties caused any loss; the misrepresentation and/or deceit exception applies; and the foreign country exception applies." Defendant's motion (Doc. No. 29) at 1-2. As the court finds that the issue of whether the pilots were employees of the government is dispositive, the court will not address the defendant's other grounds for dismissal.

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. 1346(b). The FTCA defines an "employee of the government" to include "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. Federal law governs whether an individual is an employee of the United States under the FTCA. *Logue v. United States*, 412 U.S. 521, 528 (1973).

In *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999), the Eleventh Circuit applied the "control test" to determine whether an individual is an employee of the government under the FTCA. "Under this test, a person is not an 'employee of the government' for FTCA purposes unless the government controls and supervises the day-to-day activities of the individual." *Id.* The court also noted that "[t]he central jurisdictional question under the FTCA [as to] whether the alleged tortfeasor is an 'employee of the government' . . . is to be made by reference to the degree of physical control the government exercised." *Id.* at 1380. There must be "governmental authority to supervise or control that person's daily activities." *Id.* Applying this analysis to the facts of that case, the *Means* court affirmed the district court's finding that a local county SWAT team and the county deputy sheriff were not employees of the government under the FTCA. The court noted that, even though FBI agents briefed county officials as to the potentially dangerous

situation involving Wendell Means and the location of his residence, and were also present and supervised personnel at the Means residence when the search warrant was executed, it was the local officials who made all tactical decisions about entering the residence and securing the premises. The appellate court agreed with the district court that the actions of the FBI agents "'fall[ ] short of supporting a finding that the F.B.I. had control over or directed the actions taken or methods used by the county SWAT team in entering and then securing the Means' residence.'" *Id.* at 1379 (citation omitted).

Courts have applied a similar analysis in cases involving confidential informants. In *Slagle v. United States*, 612 F.2d 1157 (9th Cir. 1980), the Ninth Circuit agreed with the district court's finding that the confidential drug informant in that case was not an employee of the government under 28 U.S.C. § 2671. The district court stated that "[i]n general, the activities of an informant are not subject to the actual control or right of control of a federal agent" and that "[w]orking as an informant is the kind of work that is usually done without supervision." *Id.* at 1161. The court considered the facts of the case and determined that the federal agent exercised very little control over the details of the informant's work; the informant had not followed the few general guidelines set out by the federal agency, further demonstrating lack of control; there was no written contract; the informant was to be paid on a per job basis and no payment had ever been made to the informant; and the place of work, instrumentalities, and tools were not supplied by the federal agency. All of these factors supported a finding that the informant was not an employee of the government.[11]

---

[11] The court noted that this case was different from the facts of *United States v. Becker*, 378 F.2d 319 (9th Cir. 1967), in which the Ninth Circuit, noting that this was a close case, nonetheless affirmed the district court's decision that the pilot who was flying his plane for the Forest Service was an employee of the government. The

10

In *Wang v. Horio*, 741 F. Supp. 1373 (N.D. Cal. 1989), the court considered whether a confidential informant, who was a financial consultant and became involved in a criminal investigation of the IRS, was an employee of the government. As in the other cases, the court noted that the "key consideration is the degree of control which the United States exercised over the activities of Horio." *Id.* at 1377. Under this analysis, the court found that:

> Horio was acting under the detailed control of Seddio. Horio did only that which Seddio authorized. Seddio gave express orders to Horio, and Horio did only what he was asked or told to do. Horio reported all of his information to Seddio, and Seddio asked Horio for additional information. . . .
>
> . . .
>
> The high degree of control exercised by the IRS over Horio is well illustrated by the fact that the IRS "wired" Horio to record certain of his conversations with plaintiffs. The IRS supplied the equipment and gave Horio the instructions on how to use it. Horio was also given instructions on what to record and what not to record, what to say, how to discuss documents, how to identify persons present, and what to ask and not ask.

*Id.* at 1378. Accordingly, the court concluded that "the IRS exercised total control over the details of all of Horio's activities," and thus, he was an employee of the United States. *Id.* at 1379.[12]

---

court found that the pilot entered into a written contract with the Forest Service after undergoing elaborate testing procedures, and that the contract required him to meet specific requirements listed in the Forest Service handbook, such as detailed rules for operating his plane. The pilot also was subject to close supervision and control during each flight, by a fire control officer who accompanied him and who was in charge of the flight, telling him where to go and what to do. Based on these considerations, the appellate court affirmed the district court's finding of no employer/employee relationship. *Id.* at 322-23.

[12] Both parties have addressed this case in their respective briefs. However, the court notes that this case was affirmed in part and reversed in part by the Ninth Circuit on the grounds that the district court erred in excluding the informant's former clients from the hearing to determine whether the informant should be certified as a federal employee. The Ninth Circuit remanded the case for a new evidentiary hearing on this issue, allowing the former clients to participate. *Wang v. United States*, 947 F.2d 1400, 1402 (9th Cir. 1991). The district court's subsequent opinion was not published, although it is clear from the appeal after the remand that the district court again found that the informant was an employee of the government. It is noteworthy that in considering this appeal, which only challenged the award for attorneys' fees, the Ninth Circuit held that "[i]n this case, a reasonable person

Applying these principles to the facts in the instant case, the court finds that the government did not control and supervise the day-to-day activities of Reynolds and Boyd. Reynolds was not required to participate in the undercover operation but was offered the opportunity to do so and accepted. Agent Dunn did not direct Reynolds regarding how he should locate and secure an aircraft suitable for the operation. It is undisputed that Reynolds initiated the call to Boyd and

> explained to him that Customs and DEA had a mission and asked whether the Merlin aircraft was available. . . . In response to Jason Reynolds' inquiry, Stuart Boyd explained that the Merlin aircraft was currently in Texas, having just undergone annual inspection, but that the aircraft was "ready to go. . . ." In this regard, Stuart Boyd called the aircraft service company in Texas and told them that Jason Reynolds would be picking up the aircraft.

Defendant's initial submission in response to Exhibit D (Doc. No. 28) ¶¶ 48-50; plaintiff's responsive submission in response to Exhibit D (Doc. No. 35) ¶¶ 48-50. It is clear that federal officers had nothing to do with the acquisition of the Merlin aircraft for the undercover operation. The court also agrees with the government that the preparatory arrangements for the flight and briefing of Reynolds and Boyd by federal officers prior to the informants' departure was similar to the efforts of the federal agents in *Means* in coordinating the execution of the federal search and arrest warrants. Ultimately, however, like the county officials in *Means*, Reynolds made the decisions about acquiring the aircraft without any control or supervision from federal agents. Furthermore, during the flight, there

---

could be satisfied that Horio was a 'run-of the mill informant,' not an exception to the general rule. Though ultimately judged to be erroneous by the district court, the government's position that Horio was not an employee was 'substantially satisfied.'" *Wang v. Horio*, 45 F.3d 1362, 1364 (9th Cir. 1995). In coming to this conclusion, the appellate court noted that the IRS repeatedly told the informant that he was not a government employee, the informant did not go to work at the IRS each morning, he did not receive a biweekly check from the government, and he had the freedom to terminate his relationship with the IRS as an informant. *Id.*

was absolutely no federal supervision over Reynolds and Boyd who flew the plane by themselves without a federal agent aboard.

The court also finds that the facts relating to the informants in the instant case are similar to the factors considered by the *Slagle* court, in that the federal agents exercised very little control over the details of Reynolds and Boyd's work; there was no written contract between the informants and the government setting forth the details of their work; Reynolds had always been paid on a per job basis; and the instrumentalities and tools, such as the aircraft, fuel, and other operational necessities, were not supplied by the Customs Service or DEA. Although the court in *Becker* did find a pilot working for the Forest Service to be an employee of the government, that case is distinguishable from the case at hand for a number of reasons. First, the pilot in *Becker* was operating under a written contract, and in no way was working as a confidential informant but was simply providing his services as a pilot. Second, the pilot in *Becker* underwent elaborate testing procedures and was required under the written contract to follow detailed rules set forth in the Forest Service handbook for operating his plane. It is undisputed that neither Reynolds nor Boyd were required to go through any testing prior to the flight or follow any specific regulations while operating the plane. Third, and probably most significant, the *Becker* pilot was subject to direct and immediate supervision and control during each flight by a fire control officer who accompanied him and told him where to go, what to do, and when to do it. As noted previously, after Reynolds and Boyd were briefed about the operation, there was no supervision or control, direct, close, or otherwise, during the flight to Colombia or the conduct of the mission while in Colombia.

Finally, the court finds that, unlike the situation in *Wang*, the government has not exercised total control over the details of the informants' activities in the instant case. The informants in this case were never wired, were not supplied with equipment from the government, and were not given detailed instructions on their actions while conducting the undercover operation. The court agrees with the defendant that the lack of control by the government in this case is further evidenced by the informants' precarious position once the aircraft was destroyed by the Colombian police, and they were forced to stay with the drug producer for several days and to rely on him to arrange for their transportation out of the country and back to safety. Clearly, the latitude and discretion left to Reynolds and Boyd in this case differs from the exacting control exercised by the government over the informant in *Wang*.

The plaintiff argues that several factors demonstrate that government agents supervised and controlled the day-to-day activities of Reynolds and Boyd, such as (1) Agent Dunn's instructions to Reynolds to fly the Merlin aircraft from Texas to St. Petersburg, Florida, and then to Ft. Lauderdale, Florida, for installation of the transponder, and then back to St. Petersburg, Florida; (2) Agent Quinn's participation in giving the informants a radio frequency to contact the drug producer and telling them where to go and what to pick up; (3) Agent Dunn's promise to Reynolds to pay him a substantial sum of money for completing the operation; and (4) the government's installation of a military transponder on the Merlin.[13]

---

[13] The plaintiff also mentions other minor factors which do not necessarily detract from the government's argument that the informants were not employees of the government. For example, Reynolds apparently signed an agreement, which stated that he was "not an employee of the U.S. Customs Service." Defendant's evidence

As to factors (1) and (2), the court simply does not find that these actions on the part of federal agents amounted to supervision and control of the daily activities of Reynolds and Boyd. Without assistance from the federal agents, Reynolds and Boyd would not have been able to engage in the operation at all, and to argue that these actions amounted to such supervision and control as to make Reynolds and Boyd employees of the government is inconsistent with the analysis set forth by the Eleventh Circuit in *Means*.[14] The plaintiff asserts that "Reynolds took the aircraft without permission of the owner or the lessee and delivered it to Dan Dunn as instructed." Plaintiff's responsive submission (Doc. No. 35) at 15. However, such a statement is contrary to the evidence of record which shows that the agents provided no direction or instruction to Reynolds or Boyd with regard to acquiring an aircraft for the operation. In fact, the plaintiff even states that "Dan Dunn did not care where or how Reynolds got the plane; it was irrelevant to Dunn where or how Reynolds 'secured' the plane." *Id.* at 9, ¶ 27. Furthermore, the court notes that even after the plane

---

submitted in response to Exhibit D (Doc. No. 30) exhibit 8. The plaintiff takes issue with the fact that the agreement was signed in 1993, and bears the signature "Jason Robards." *Id.* However, under the signature it states that this is an "Assumed Name," and there seems to be no dispute that Reynolds signed the document. *Id.* Boyd also apparently signed an agreement "saying that I understood that I was not an agent," *id.*, exhibit 5, at 52, but the plaintiff complains that the government has not produced the document. However, it again appears to be undisputed that Boyd signed a document to that effect, and thus, the Court is not troubled by the government's inability to produce this document. The plaintiff also argues that Reynolds told Agent Dunn that the aircraft was owned by Latham and was being leased to Patterson. Reynolds testified that he "thinks" he relayed this information to Agent Dunn, but Reynolds stated in his deposition that he also told Agent Dunn that "I had sold [the plane] to Latham Aviation and that they had told me I could use it whenever I wanted." Plaintiff's evidence submitted in response to Exhibit D (Doc. No. 34) exhibit 1, at 55. Regardless of what voluntary information Reynolds gave Agent Dunn about the aircraft, it is clear that Agent Dunn's knowledge of this information did not constitute supervision or control over the day-to-day activities of Reynolds.

[14] The plaintiff also emphasizes that the aircraft was stored in the Customs or DEA hanger at various locations while readying the aircraft for the flight to Colombia, and that Reynolds could not use the aircraft the night prior to his departure for Colombia. The court finds that these factors do not make a difference in the overall supervision and control of Reynolds and Boyd and were simple safety and security precautions taken in preparation for the flight.

15

was secured, federal agents did not control the details of the trip or the manner in which Reynolds and Boyd conducted it.

As to Agent Dunn's statements to Reynolds about receiving a large sum of money for the operation, Reynolds testified in his deposition that Agent Dunn told him that the mission would be his "retirement trip," and that he would "max out on moiety." Plaintiff's evidence (Doc. No. 34) exhibit 1, at 58, 61. Reynolds testified that his understanding of these statements was that the maximum he would receive for the trip was two-hundred and fifty thousand dollars. *Id.* The court finds that Reynolds was never guaranteed any particular amount of money for his efforts. Furthermore, the court finds that even if he was guaranteed money for successful completion of the operation, the court is at a loss to see how that necessarily makes Reynolds an employee of the government. Finally, as for the government's installation of the transponder on the aircraft, the court finds that the government's act of fitting the aircraft with a device to monitor its whereabouts while in foreign airspace was simply a necessity under the circumstances and was not an exercise of control over the daily activities of the informants. Accordingly, the court concludes that neither Reynolds nor Boyd were employees of the government.

## V.     Conclusion.

Because there is no genuine issue of material fact regarding whether Reynolds and Boyd were employees of the government, the government cannot be liable for their actions under the FTCA. Accordingly, the defendant's motion for summary judgment will be granted and the case dismissed with prejudice. Costs will be taxed against the plaintiff and in favor of the defendant.

Done, this ___7th___ of October, 1999.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE