# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

01 DEC 19 PM 1: 02

| | | |
|---|---|---|
| **PATTERSON & WILDER CONSTRUCTION COMPANY,** | ] | |
| Plaintiff(s), | ] | |
| | ] | CV-97-N-2840-S |
| vs. | ] | |
| **UNITED STATES OF AMERICA,** | ] | **ENTERED** |
| Defendant(s). | ] | DEC 19 2001 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671- 2680, and this Court has jurisdiction under the provisions of 28 U.S.C. §1346(b). The case was tried to the court on May 4, 2001.

The following facts are undisputed, based on the parties' pretrial submissions:

Frank Patterson is the president and sole owner of Patterson and Wilder Construction Company in Pelham, Alabama. William "Billy" Latham was employed by Patterson and Wilder Construction for 30 years and at all times relevant to this lawsuit. In approximately 1991 or 1992, Latham formed and became the president of Latham Aviation, an aircraft leasing company. At that same time, Stuart Boyd, an aircraft pilot for Patterson and Wilder, became an employee of Latham Aviation.

Sometime in 1993, Stuart Boyd contacted Jason Reynolds because Patterson and Latham had decided to upgrade from a Baron aircraft to a Merlin aircraft, and Boyd knew Reynolds to be knowledgeable about that type of aircraft. Reynolds located a Merlin aircraft in Texas and brokered Latham Aviation's purchase of the aircraft. The Merlin aircraft was



purchased by Latham Aviation in August or September of 1993 for somewhere between $235,000 and $240,000. A bank loan was used to finance $150,000 of the purchase price, and the remainder of the consideration came from the bank account of William Latham. Patterson and Wilder did not pay any part of the down payment or purchase price, nor did it co-sign for the loan. Latham Aviation paid Reynolds a commission for his efforts in locating and brokering the purchase of the Merlin aircraft.

On October 1, 1993, Patterson and Wilder Construction Company and Latham Aviation executed a Lease Agreement whereby Latham Aviation leased both the Merlin aircraft and its pilot, Stuart Boyd, to Patterson and Wilder Construction Company for a period of seven years at a rate of $3500 per month and $650 per week, respectively. The Lease Agreement provided that the lessee could opt to purchase the aircraft for $8000 at the expiration of the lease, provided the lessee had made all payments due under the lease.

Apart from general maintenance, the only major improvement made to the Merlin aircraft was the installation of a Global Positioning System ("GPS") which was purchased by William Latham and/or Latham Aviation at a purported cost of between $10,000 and $11,000. Patterson and Wilder Construction Company did not reimburse Latham or Latham Aviation for the purchase of the GPS.

Stuart Boyd did not have the necessary credentials to be an insurable pilot on the Merlin. Therefore, Latham Aviation placed Jason Reynolds on its insurance policy and sent Stuart Boyd to flight training school in Texas. Patterson or Patterson and Wilder Construction Company paid Jason Reynolds to attend flight training school with Boyd, and paid for Reynolds' travel, lodging, meals and expenses. After Stuart Boyd had logged the

2

necessary flight time with the Merlin, Latham and Patterson requested that Reynolds pilot for them when Boyd was not available. Reynolds was paid for flying on each of these trips.

At all times relevant to this lawsuit, Daniel W. Dunn, a Supervisor Special Agent for the Office of Investigation of the U. S. Customs Service in Tampa, Florida, was in charge of an air smuggling investigation group which included U.S. Custom Case Agent Guillermo "Willie" Cancio and U.S. Drug Enforcement Agent Robert Quinn. Dunn contacted James Reynolds, who in turn called Stuart Boyd, asking about the use of the Merlin for a Customs and DEA mission. Boyd told Reynolds the Merlin was in Texas for an annual inspection, but that the aircraft was "ready to go." Boyd called the Texas aircraft service company and told them that Reynolds would be picking up the aircraft.

On November 8, 1994, the Customs Service gave Reynolds, d/b/a Wheels and Wings, Inc., a cashiers check in the amount of $10,000 for the rental of the Merlin, operational expenses, insurance and fuel for seven days. Reynolds purchased equipment he deemed necessary for the trip - charts, life rafts, survival gear, etc.

On November 9, 1994, Reynolds and a Customs service pilot flew the Merlin from Tyler, Texas, to St. Petersburg, Florida. Upon arriving in St. Petersburg, Reynolds called Boyd to tell him he had picked up the Merlin.

On November 10, 1994, Reynolds flew the Merlin to Fort Lauderdale, Florida, where a military transponder was installed on the aircraft.

When the pilot originally scheduled to fly with Reynolds to Columbia changed his mind about making the trip, Reynolds asked Boyd to co-pilot for the trip. On or about November 13, 1994, Boyd joined Reynolds in St. Petersburg.

At a meeting at the DEA offices, agents Dunn, Cancio and Quinn advised Boyd of the possible risks associated with the trip, explained the need for confidentiality, and gave Boyd and Reynolds the longitude and latitude coordinates of their destination. Following the meeting, Boyd and Reynolds flew the Merlin from the St. Petersburg Airport to Marathon, Florida, where the aircraft was refueled. Then Boyd and Reynolds flew from Marathon, Florida to Howard Air Force Base in Panama, Central America. In Panama, Boyd and Reynolds met with Customs and DEA agents, created the next day's flight plan, refueled, and spent the night at Howard Air Force Base. Boyd piloted the aircraft from Panama to Columbia, South America, the next day, arriving at the longitude/latitude coordinates and landing on a grass airstrip in the jungle.

Upon landing in Columbia, Boyd and Reynolds were met by the narcotics producer and they flew to a second location. At the second location, they saw Colombian policemen on horseback so they immediately left and returned the Merlin to the site where they had originally landed. The narcotics producer then traveled by Jeep to collect the narcotics and fuel while Boyd and Reynolds waited near the aircraft with his associates.

At some point, Boyd and Reynolds became nervous, so Reynolds hid in the nearby woods while Boyd remained by the aircraft. Columbian police (DAS) arrived on the scene and pointed a shotgun at Boyd, handcuffed him, and arrested him and the others. Eventually, the group was marched through the woods to a ranch house where they were kept under guard.

After the group left for the ranch house, the narcotics producer returned to the scene with narcotics in his Jeep. Upon seeing the Columbian police, the narcotics producer

turned the Jeep around and fled the scene as the police opened fire on him. After hiding the Jeep and the narcotics, the narcotics producer approached the ranch house and began negotiating with the Columbian police for the release of Boyd and Reynolds. He was successful in securing the freedom of his men, Boyd, and Reynolds in exchange for the payment of bribe money and the Merlin aircraft.

The Columbian police attempted to fly the Merlin, but crashed it shortly after takeoff, destroying both engines and props. After the Columbian police left the scene, the narcotics producer and his men, afraid that the wreckage might be seen from the air by other Columbian police, dragged the aircraft into the woods, burned it, and buried the remnants.

With no means of transportation out of the country, Boyd and Reynolds spent 11 days with the narcotics producer in Columbia, eventually making their way out of the jungle to the producer's home in Bogota. The narcotics producer bought commercial airline tickets for Boyd and Reynolds to return to Miami.

Upon his return, Boyd went to Frank Patterson and explained what happened to the Merlin. Patterson told Boyd that he had reported the Merlin stolen shortly before Thanksgiving 1994, when he was unable to locate Boyd or the aircraft. On Patterson's advice, Boyd contacted the FBI, explained what had happened and asked them to get in touch with Customs in order to verify his explanation. After confirming Boyd's explanation with Customs, FBI Agent Frank Evans informed Latham that the Merlin had been used in a covert operation. Latham contacted Customs and explained that the Merlin was his and that he had not given permission for its use. In separate conversations with Latham, Boyd and Reynolds blamed each other for the taking of the aircraft; Reynolds claimed Boyd told

him that Latham had authorized the use of the aircraft, while Boyd claimed the whole matter was Reynold's fault.

After the Merlin aircraft was destroyed, Patterson and Wilder Construction Company stopped making lease payments to Latham Aviation. By agreement dated January 8, 1996, the Customs Service and DEA subsequently paid Boyd and Reynolds $270,000 for their services in the covert operation but insisted that the money be placed in an escrow account and released to the pilots only after they had settled all outstanding claims against the government and had obtained hold harmless and indemnification agreements from Latham in favor of the government. By June 4, 1996, the two pilots had executed a settlement agreement with Latham whereby he was paid $240,000; Patterson was not a party to that agreement.

The court further finds:

Boyd and Reynolds were temporary "employees of the United States" within the meaning of 28 U.S.C. § 2671 during the time they engaged in the covert operation which resulted in the loss of the Merlin. In contrast to the facts in *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999), the Customs and DEA agents in this case made all the tactical decisions related to the covert operation and directed, in detail, the actions and methods to be used by Boyd and Reynolds in undertaking the mission. The United States provided support and lodging at Howard Air Force Base in Panama during the trip to Columbia and agents were standing by to provide further direction if the plan was aborted. It is also clear that Boyd and Reynolds were offered payment for their services, and did receive payment of $270,000.

The plaintiff's damage award in this action cannot exceed $129,047.53, the amount claimed from the administrative agency on April 4, 1995. Although generally a plaintiff under the Federal Tort Claims Act may not seek greater damages than that sought in any prior administrative claim, an exception exists where "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency." 28 U.S.C.A. § 2675(b); *Cole v. United States*, 861 F.2d 126, 1262 (11th Cir. 1988). The plaintiff argues that the Eleventh Circuit has held that a reasonably based change in expectation as to the severity and permanence of a physical injury is newly discovered evidence within the meaning of section 2675(b). *Id.*, citing *Fraysier v. United States*, 766 F.2d 478 (11th Cir.1985). To the extent the cases pertaining to physical injuries apply to plaintiff's claims of economic loss, the record does not support the plaintiff's assertion that it was surprised by the permanence of its injury. The evidence establishes the plaintiff knew shortly after Boyd returned that the Merlin airplane was irreparably damaged, burned and buried. Therefore, at the time of the administrative claim in April 1995, the plaintiff knew the airplane was a total loss. The plaintiff's argument that it expected to be made whole by the government is not reasonable based on the evidence that the government recognized Latham as the owner of the Merlin and in light of plaintiff's duty to mitigate any damages. Accordingly, to the extent plaintiff is entitled to damages, those damages must be limited to the amount of its administrative claim.

The plaintiff claims it is entitled to compensation as an owner of the Merlin aircraft because it had a lease/purchase agreement with Latham which afforded it the opportunity to purchase the aircraft for $8000 upon termination of the lease. The court finds the parties

intended to create a lease and that the plaintiff is the lessee of the airplane rather than an owner. The court observes that the contract between the parties provides, in pertinent part:

> . . .
> 12. <u>No passage of title.</u> This agreement is a lease, and the Lessee does not acquire hereby any right, title, or amount whatsoever, legal or equitable, in the Aircraft or to the proceeds of the sale of the Aircraft, except its interests as Lessee under this lease.
> . . .

Furthermore, the mere inclusion in the lease of the option to purchase does not establish an ownership interest in the airplane. *See, e.g. Commercial Union Bank v. John Deere Industrial Equip. Co.*, 387 So.2d 787 (Ala. 1980) (finding inclusion of option to purchase does not make lease security interest). The court notes that the option to purchase the Merlin could be exercised only at the end of the lease period, and not at any time during the term of the lease. Further, the $8000 purchase price required to exercise the option was more than a nominal amount. *Id.*

Even if the parties intended that plaintiff acquire an equity interest in the airplane, the plaintiff did not present any evidence showing how much of those amounts it paid to Latham should be attributable to its equity interest. The plaintiff established that, of the 64 payments it agreed to make under the lease, it made 19 payments to Latham for a total of $62,532.71. Plaintiff also paid $44,314.44 for work on the aircraft. It is clear that most of these amounts paid by the plaintiff are attributable to the cost of leasing and operating the airplane, and not to the accrual of equity. The government's expert witness, Thomas Daniel Walsh, testified that there would be very little equity built up early in such an arrangement. Mr. Walsh further testified that aircraft require ongoing, regular maintenance. The court notes

that plaintiff regularly used the Merlin in its business. The parties agreed that, apart from general maintenance, the only major improvement made to the Merlin aircraft was the installation of a Global Positioning System ("GPS") which was purchased by William Latham and/or Latham Aviation. Accordingly, the court finds the $44,314.44 plaintiff paid for work on the Merlin does not support any claim to an equity interest in the airplane, but rather represents regular upkeep and maintenance required by the terms of the lease. This court finds that the evidence does not establish any legally significant ownership interest in the airplane for Patterson and Wilder and that Patterson and Wilder is not entitled to any damages as owner of the airplane. Latham was the actual owner of the Merlin, and the $240,000 Reynolds and Boyd were required to pay to Latham pursuant to their settlement with the government satisfied Latham's loss.

The evidence does establish that plaintiff was the sole lessee of the airplane. Plaintiff did not point to any Alabama cases showing the damages due to the lessee of a commercial vehicle. The typical damages in Alabama for an injury to a commercial vehicle is the amount of money which would remunerate the owner for the repairs needed to substantially restore the vehicle to its former condition and the reasonable value of its hire or use during the time required to make such repairs and fit it for business. *Dean v. Johnston*, 281 Ala. 602, 206 So.2d 610 (1968); *Wilson & Co., Inc. v. Sims*, 250 Ala. 414, 34 So.2d 689 (1948); *Etno v. Rivers*, 644 So.2d 3 (Ala. App. 1994); *Fuller v. Martin*, 41 Ala. App. 160, 125 So.2d 4 (1960); *and see Rowell v. Treadwell Ford, Inc.*, 511 F.2d 164 (5th Cir. 1975) (same). *Winn-Dixie Montgomery, Inc. v. Holt*, 57 Ala. App. 499, 329 So.2d 556 (1976) (measure of damages depends on whether vehicle is commercial or non-commercial vehicle). Recovery cannot

9

be had for both the total loss of a commercial vehicle and the loss of use of the same vehicle. *Joe Sartain Ford, Inc. v. American Indemnity Co.*, 399 So.2d 281 (Ala. 1981), *overruled on other grounds, Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So.2d 671 (Ala. 1989); *Fuller v. Martin*, 41 Ala. App. 160, 125 So.2d 4 (1960); *Hunt v. Ward*, 262 Ala. 379, 79 So.2d 20 (1955).

The evidence in this case was that the Merlin airplane was a total loss and the owner, Latham, recovered for that loss. The lessee plaintiff has not established that it is entitled to any additional recovery under Alabama law, and did not present evidence of any damages shown to be compensable under Alabama law.[1] The plaintiff having failed to establish by a preponderance of the evidence, or otherwise, an essential element of its claim, the court finds for the defendant, United States of America, and against the plaintiff, Patterson and Wilder Construction Company. A separate order will be entered.

---

[1] Plaintiff merely claimed it was entitled to damages as an owner of the airplane and did not present any argument regarding the damages due to it, as lessee, for loss of use of the Merlin. A lessee is possibly entitled to damages based on loss of use during the time the commercial vehicle is out of service for repairs. *See Koninklijke Luchtvaart Maatschaapij, N. V. v. United Technologies Corp.*, 610 F.2d 1052 (2d Cir. 1979). Even if the court found such damages appropriate in this case, the evidence presented by plaintiff on the issue of damages was not related to the value of the "use or hire" of the Merlin. Plaintiff's claims for costs of commercial airline travel and hotels are not the appropriate measure of damages, since such damages do not relate to the value of the "use or hire" of the Merlin. Similarly, the amounts plaintiff paid for the lease of a substitute airplane cannot be evidence of the value of use of the Merlin, since plaintiff's payments in the new lease included the undifferentiated costs of pilot, hanger, insurance, maintenance and fuel. Such costs do not represent the value of the use or hire of the Merlin. Neither is the cost of hanger rent or fuel an appropriate measure of damages. *See generally Wilson & Co., Inc. v. Sims*, 34 So.2d at 690 (discussing measure of damages for loss of commercial vehicle and stating loss of profits was not an appropriate measure of damages). The only evidence tending to show the value of the use of the Merlin is the $3500 lease payment made for the Merlin while it was in use.

Done, this \_\_\_18th\_\_\_ of December, 2001.

_[signature]_

EDWIN NELSON, a/k/a Scrooge
UNITED STATES DISTRICT JUDGE